George J. NOVAK, Appellant,

v.

Cynthia COX, Appellee.

No. 86–1130.

District of Columbia Court of Appeals.

Argued July 10, 1987.
Decided March 9, 1988.

George J. Novak, pro se.

Linda Perilstein, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, MACK, Associate Judge, and REILLY, Senior Judge.

REILLY, Senior Judge:

In an appeal from a judgment entered in the landlord-tenant branch of the Superior Court, the landlord in his brief has raised more than twenty objections to the written findings and conclusions of law contained in the memorandum opinion of the trial court accompanying its order. In our view, most of these assignments of error have no merit, but as certain findings appear lacking in evidentiary support, and these in turn led to erroneous conclusions affecting the final accounting, we remand the case for further findings and the entry of a revised judgment. A brief summary of the proceedings follows.

The landlord, appellant here and plaintiff in the trial court, was the owner of a single house which he leased on October 30, 1980, to Cynthia Cox for a period of one year at a rental of $500 a month. The terms of the written lease provided that the tenant, with the written consent of the landlord, could sublet portions of the house. Apparently, the parties expected that this option would be exercised by the tenant for another clause provided that the premises would be used as a residence "for four persons only." Another provision in the lease required the leasee to pay a penalty for late charges if the monthly rent was in arrears for more than ten days. The final paragraph provided that at the expiration of the term, the lease would continue on a month-to-month basis. This provision became operative after October 31, 1981, when the tenant elected to stay on the premises.

So far as the record shows, the terms of the tenancy remained unchanged until February 28, 1982, when the landlord, by letter, notified Miss Cox and two of her subtenants, that he intended to raise the monthly rental to $570. In May of that year, the tenant orally agreed to this increase and for several months thereafter the landlord was paid at the new rental level.

Less than a year later, after the tenant had fallen behind in rent payments, she and the landlord reached an oral understanding which permitted her to remain in the house at a reduced rate. The terms of this arrangement is the subject of conflicting testimony. It is described by the court in one of its disputed findings (No. 5) as,

5. In February 1983, Plaintiff orally agreed to reduce the monthly rent to $500 and further agreed that each occupant would pay $167 per month.

Whatever this arrangement was, it continued until August 14, 1984, when the landlord served Miss Cox with a letter prefaced by a "formal notice ... to vacate the premises within 30 days." The letter then explained that it was necessary to make repairs on such a scale that it would be impossible for persons to live in the house while these were in progress. It also stated, *inter alia*, that although the landlord had reduced the rent temporarily as a favor to the tenant when she was sick, he had vainly attempted to raise it back to the 1982 level, and was also faced with high maintenance costs because of damages caused by the negligence of the subtenants for which he deemed the tenant responsible.

Notwithstanding this notice, the tenant (and at least one subtenant) continued occupancy of the house through the month of September 1984, but without paying any rent for that month. On October 4th of that year, the landlord commenced an action for summary possession and a money judgment on the ground of "defendant's default in the payment of rent, there *being due rent in the sum of $6,840 for the period from October 1, 1983 to October 1, 1984.*" (Emphasis supplied.) The complaint alleged a monthly rental of $570.

After retaining counsel, Miss Cox filed a lengthy answer in which she admitted holding the premises as a tenant, but denied all the other allegations. She also counterclaimed for the entire amount of rent claimed, *i.e.*, $6,840 on the ground that (a) violations of the housing regulations had

left the house in such a state of disrepair that it was uninhabitable, and (b) because of rent overcharges and refunds ordered by the Rent Administrator and the Rental Housing Commission she was entitled to that sum.[1]

Over landlord's opposition, Judge Shuker granted a motion for discovery. Each party thereupon served interrogatories upon the other and received answers. Pursuant to another order of the motions judge, the tenant paid $570 into the registry each month beginning in November 1984 through September 1985, when the tenant surrendered the premises, thereby mooting the issue of possession. Thus, when the case ultimately went to trial before another judge in April 1986, the only issues before the court were the landlord's claim for rent arrearage and the tenant's counterclaim.

The court in its findings and conclusions resolved the first issue against the landlord, holding that no rent was due him for the relevant period, and awarded the tenant a rent abatement totaling $744 for certain violations of the housing code. With respect to the $6,410 deposited in the registry, the court ordered that the amount of $5,376 be disbursed to the landlord and $1,044 to the tenant.

In his sweeping attack on the trial court's findings and conclusions, appellant has pointed out some statements in the memorandum opinion which were inaccurate. Several of these, however, are concerned with minutiae rather than substance, e.g.:

(1) The second sentence states "the court instructed the parties to submit proposed findings of fact and conclusions of law." Actually, the court instructed only the tenant to submit such a document.

(2) Finding of Fact No. 6 enumerates the number of "tenants" (i.e., occupants) of the house during particular months in the rental year which is the subject of the complaint October 1983 through September 1984. It contains no figures for the

months of April, May, June and July 1984. This omission was apparently a typing error after the court had decided to accept the data on this point supplied by the defendant's proposed findings. According to this document, the house was occupied by three persons during this four month period.

(3) Finding No. 8 reads: "Plaintiff never informed defendant that the difference between the agreed upon rent ($500 per month) and the reduced rent would accrue and would be due and owing at some future date." The figure mentioned in the parenthesis is inaccurate, for in a previous finding (No. 4), the court correctly found that the parties had agreed to a rent of $570.

(4) In the "Conclusions of Law," the first sentence states the "Defendant reformed the lease and agreed...." As the defendant here was the tenant, obviously the individual referred to was the plaintiff, the landlord. A similar inaccurate transposition of parties appears in the fifth paragraph of the "conclusions," where the court analyzed the contentions with respect to violations of the housing code.

We do not regard any of the foregoing as prejudicial error for these misstatements or omissions, as well as a reference in the concluding paragraph of the year 1986, rather than 1985, are readily susceptible of corrections which reflect the obvious intent of the trial court.

■ Turning now to the substantive issues raised by the appeal, we note that at the outset of the jury-waived trial, it became apparent that the asserted amount of rent default, viz., the figure of $6,840 mentioned in the complaint, was greatly exaggerated. Evidence was received of a stipulation that the landlord had received a total of $4,655 in rent during the twelve-month period set forth in the complaint. The landlord argued, however, that the sum claimed by him was not limited to money

1. Although this was a verified answer, defendant later conceded in a response to an interrogatory that there had never been any proceedings before the rental agencies. In fact, there was never any evidence that the rent control laws had application to the house occupied by the tenant.

due in that particular year, but included arrearages and late charges for various months preceding October 1, 1983. The court rejected this argument on the ground that the complaint limited recovery to such monthly rents as fell due in the period set forth in the complaint. We affirm this ruling as correct in view of the narrow wording of the complaint to which we have adverted, *supra*. We also discern sufficient evidence to affirm the finding that any late charges which occurred during the relevant period were waived.

We have difficulty, however, with the court's determination that because of the verbal agreement of February 1983 concerning a rent reduction, the landlord was not entitled to any rent arrearages for the period October 1, 1983 to September 15, 1984, because he had "received exactly what he had contracted for during [that] period."

The trial judge reached this conclusion apparently on his interpretation of the tenant's testimony that in February of 1983, the landlord had agreed to reduce the rent to $500 or $167 per occupant. She testified that in subsequent months, the landlord accepted checks individually from the subtenants, which were either left on a "bulletin board" in the house or mailed directly to his account at a savings and loan bank. Although she was aware that during the summer of 1984, one subtenant was not paying "her full share" of the rent, she told the court that the landlord had never asked her to make up the missing portion. These are the only segments of the tenant's testimony which lend support to the conclusionary finding excepted to by appellant:

> To the extent that plaintiff did not receive the full amount from each subtenant, the court further finds as a matter of law that plaintiff waived his right to hold defendant personally liable for the arrearages that accrued from February 1, 1983 to September 15, 1984.

■ But the mere fact that the tenant was not pressured each month by the landlord to make up any particular rent underpayment did not amount to a waiver as a matter of law of the tenant's obligations. It is well established that when rent falls due "it became a debt which the tenant was bound to pay unless the parties entered into a contrary agreement supported by consideration." *Crowder v. Lackey*, 46 A.2d 699, 700 (D.C.1946).

■ Implicit in the court's conclusion, *supra*, is the premise that the rent reduction agreement transformed the contract between the parties into a multi-tenant relationship, under which the landlord treated each occupant of the house as his own individual tenant and made it his own responsibility to collect rent from them, and thereby relieved Miss Cox from any obligation to pay rent unpaid by them. This is a somewhat surprising view of the matter in view of testimony by defendant's witness—the subtenant who remained on the premises during the litigation—that on one occasion when the landlord wanted to place an additional occupant in the house, he was told by the tenant that he had no right to select any subtenant for her.

More importantly, it appears that the court overlooked the fact that the tenant never formally disclaimed liability for rent deficiencies by the subtenants.[2] On the contrary, in submitting proposed findings and conclusions for the court's consideration, the tenant in a proffered statement of account conceded liability for rents underpaid in certain months, *viz.*, December 1983, July, August, September and October 1984, as well as claiming credit for overpayments in other months, irrespective of the source of payment. Indeed the tenant could scarcely have done otherwise without giving up her counterclaim for rent abatement to offset these deficiencies in rent payments. As all the inhabitants of the house were equally inconvenienced by the failure of the landlord to maintain it in good repair, the defendant was not entitled to be the sole beneficiary of the rent abatement unless she was also the only legal

---

2. The court also overlooked defendant's answer to the complaint in which she conceded that she held the premises as tenant during the particular twelve month period.

obligor for rent during the periods in which housing code violations existed.

■ We affirm the court's findings that the landlord was derelict in failing to make prompt repairs to the bathroom, ceiling, and the window locks, for although there was conflicting testimony on these issues, the record shows sufficient evidence to support them. Despite tenant's contentions, we allow the figure for rent abatement of $774 to stand, as it was based upon a reasonable estimate of the damage suffered by the tenant.

But even though this total is used as an offset to the rent due and unpaid to the landlord for the twelve-month period, it does not completely satisfy the rental deficiency noted in the tenant's accounting exhibit. Accordingly, we remand the record for the court to determine, consistent with this opinion, the amount of the rental deficiency in the designated twelve-month term.

■ The judgment is also flawed by one other unsupported finding which caused error in the disposition of the money paid into the registry of the court. Pursuant to an order of Judge Shuker, prior to the trial of the case, as we have noted, the tenant paid $570 a month into the registry beginning in November of 1984, and continuing through September 1985, when the tenant quit the premises—a total of $6,420.[3] According to the tenant, she was entitled to a refund of some $2,600 of that amount, although she conceded that she had filed no opposition to the motion asking a monthly deposit of $570. Her contention was based on the theory that since she and another woman were the only occupants of the home for that twelve-month period, the rent due each month was only $334. The court correctly rejected this contention, noting that by his letter dated August 15, the landlord had put the tenant on notice that he would no longer accept partial payments. Hence, the court ruled the tenant could not remain on the premises without paying its "fair use and occupancy value." Where the court went astray was in fixing such amount as $500 per month, thereby allowing the tenant a monthly rebate of $70—a total of $770—in the final order with respect to the release of registry funds. There is no evidence in the record to show that the fair rental value was as low as $500. The landlord testified without contradiction that after the defendant left in September 1985, he was able to rent the premises for $1,000 a month. Moreover, the parties to this case had agreed on a rent of $570 as far back as 1982. It is true, as the court observed in its conclusions that even if the letter of August 15, 1984, put the tenant on notice of a reinstatement of the $570 figure, he could not impose a contractual obligation upon her to pay this amount without her assent. But, once the notice to vacate became effective, there is nothing in the law that gave the tenant the right to remain in the house without paying what the landlord gave notice he was charging.[4]

Thus, it was error to have credited the tenant with $770 of the amount deposited in the registry. Re-examining the record on remand, the trial court may remedy this error[5] by entering a judgment for the landlord in a sum which should take into account any deficiency in rent during the twelve-month period ending September 30, 1984, and the proper rent due for the succeeding months the tenant occupied the premises, less the $774 rent abatement due the tenant.

---

3. For some reason, which does not appear in the record, the tenant paid only $150 into the registry for October 1984, the first month of the protective order. As no rent was paid directly to the landlord in October, the court should take this deficiency into account in calculating the proper money judgment.

4. *Nicholas v. Howard*, 459 A.2d 1039 (D.C.1983), is clearly distinguishable, for there we found that the appellant, a new owner, had never negotiated a rental agreement with the tenants of the grantor.

5. Unfortunately, this error cannot be cured by revising the disbursement order, for the record shows that the civil finance office actually made the disbursement the date after the order was entered. On that date, the appellant had not received a copy of the order and thus had no opportunity to move for a stay pending appeal.

*Affirmed in part; reversed and remanded in part.*

MACK, Associate Judge, dissenting:
I would affirm the trial court.